# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

## NO. 2023 CA 1048

*MRT*

*JMG*
*by MRT*

## ROBIN CARONNA AND JOSHUA CARONNA, SR.

## VERSUS

## OUTDOOR LIVING, LLC AND/OR OUTDOOR LIVING POOLS, LLC, AND LATHAM POOL PRODUCTS, INC.

*Judgment Rendered:* **DEC 3 0 2024**

\* \* \* \* \* \* \* \*

Appealed from the
23rd Judicial District Court
In and for the Parish of Ascension
State of Louisiana
Case No. 128,755, Division B

The Honorable Cody M. Martin, Judge Presiding

\* \* \* \* \* \* \* \*

| | |
|---|---|
| Jennifer G. Prescott<br>Prairieville, Louisiana<br>and<br>Marcus J. Plaisance<br>Mark D. Plaisance<br>Prairieville, Louisiana | Counsel for Plaintiffs/Appellants<br>Robin Caronna and<br>Joshua Caronna, Sr. |
| Timothy E. Pujol<br>Barbara Lane Irwin<br>Ashley D. Tadda<br>Gonzales, Louisiana | Counsel for Defendant/Appellee<br>Outdoor Living, LLC and/or<br>Outdoor Living Pools, LLC |

\* \* \* \* \* \* \* \*

*Penzato, J. Concurs with reasons by Miller*

BEFORE: GUIDRY, C.J., THERIOT, PENZATO, MILLER, AND GREENE, JJ.

*Miller, J. Concurs by Miller*

*Greene, J concurring in part, dissenting in part. by Miller*

**THERIOT, J.**

This appeal arises from a judgment in favor of the homeowners in their suit for damages resulting from a leaking swimming pool. The homeowners appealed, and the swimming pool contractor filed an answer to the appeal. For the reasons set forth herein, we reverse in part, amend the judgment, and affirm as amended.

## FACTS AND PROCEDURAL HISTORY

Plaintiffs, Robin Caronna and Joshua Caronna, Sr., engaged defendant Outdoor Living, LLC and/or Outdoor Living Pools, LLC ("Outdoor Living") to install a swimming pool in the backyard of their home in May of 2019. Pursuant to the May 6, 2019 contract executed by the parties, Outdoor Living agreed to "furnish material and labor" to construct a 432 square foot fiberglass swimming pool and 671 square foot brushed concrete deck at the Caronnas' home for the sum of $47,250.00.[1] The contract specifications included a fiberglass pool shell; general construction services, such as pool plans and permits, excavation, dirt removal, insurance during construction, and initial equipment start-up service and instruction; installation of coping, tile, and concrete decking; electrical supplies and work; pool plumbing and equipment, including all pool piping, valves, Pentair pool pump, Pentair filter, automatic surface skimmer, and return inlets; and other miscellaneous items and services. Outdoor Living's construction of the pool was complete and the pool was turned over to the Caronnas on June 22, 2019.

After about a month of using the pool, the Caronnas began to experience problems with the Pentair pool pump installed by Outdoor Living. On July 19, 2019, August 3, 2019, August 11, 2019, and August 29, 2019, Robin contacted Bryce Noel, the Outdoor Living employee primarily responsible for the installation of their pool, because the pump had shut off and an error code was displayed. On

---

[1] After the contract was signed and the contract price of $47,250.00 was paid in full, the Caronnas decided to add a water feature to the pool for an additional cost of $1,950.00. The water feature was installed by Outdoor Living along with the pool, and an invoice was sent to the Caronnas for the water feature on July 3, 2019. This invoice was never paid, despite numerous requests by Outdoor Living.

each occasion, Bryce came out to the Caronnas' home and followed the instructions provided in the "Installation and User's Guide" for the Pentair pool pump for troubleshooting error codes. This involved disconnecting and reconnecting power to the pump and then performing additional troubleshooting only if the error code did not clear after resetting the pump. In each instance, the error code cleared once the pump was reset. Bryce explained to Robin that the pump was shutting off as a safety feature to extend the life of the pump when something was blocking the impeller, and he provided instructions for resetting the pump when that happens. Thereafter, Robin did not contact Bryce about error codes again and instead followed the instructions to reset the pump when necessary.

On Saturday, October 12, 2019, the Caronnas noticed that the water level had dropped significantly in the pool, approximately to the bottom of the tiles. The Caronnas refilled the pool, bringing the water level back up to the middle of the tiles. On Sunday morning, October 13, 2019, Robin sent a text message to Bryce to let him know that the water level in the pool had dropped four to five inches overnight for the past two nights. Bryce responded to Robin's text on Monday morning, October 14, 2019, stating that he would come out and take a look at the pool. Robin also mentioned to Bryce at this time that water was seeping through the cracks in the concrete when they refilled the pool. After going out to check on the pool, Bryce concluded that a loose skimmer plug was the cause of the problem and would need to be replaced. Bryce installed a submersible sump pump on Monday afternoon to drain the groundwater around the pool so that he could safely lower the water level further in the pool and make the necessary repairs. He returned on Tuesday, partially drained the pool, replaced the loose skimmer plug, and then began refilling the pool. Once the pool was refilled to the proper level, Bryce removed the sump pump, believing that the issue had been resolved.

However, when Bryce returned to the Caronnas' home on Wednesday to check on the pool, he discovered that the pool was still losing water. At that point, Bryce suspected that a leak was present and contacted a leak detection company to schedule an inspection of the Caronnas' pool. He did not notify the Caronnas that he suspected a leak at this time, nor did he reinstall the sump pump or advise the Caronnas to keep refilling the pool. Later that day, the Caronnas returned home from work and noticed a significant drop in the water level of the pool, with cracking and separating of the concrete decking, and the water in the pool turning brown. Robin immediately notified Bryce of the condition of the pool by text message, and explained that it appeared the pool was "popping" up. At that time, Bryce informed Robin that he had suspected a leak after checking on the pool earlier in the day and had already contacted a leak detection specialist. He returned to the Caronnas' home that night and reinstalled the sump pump, but by Thursday afternoon, the water in the pool was almost completely drained and a large crack in the shell of the pool was visible in the deep end.

After the damage was discovered, Outdoor Living's owner, Donald "Skip" Noel, Jr., contacted Latham Pool Products, Inc. ("Latham"), who manufactured the fiberglass shell for the Caronnas' pool, about the cracked pool shell. Based on the information and pictures provided, Latham believed that the damage was caused by hydrostatic pressure, which was not covered by its warranty.[2] After advising Skip that the damage was not covered, Latham sent an estimate and repair agreement to Outdoor Living for the repairs to the Caronnas' pool.

On October 29, 2019, Bryce sent a text message to Robin to let her know that Latham was going to schedule the repairs to their pool; however, Robin insisted that the pool and concrete deck needed to be replaced, not repaired, and

_____

[2] Latham provides a limited lifetime warranty on its Trilogy brand of fiberglass pools, which provides limited coverage for the structure and surface of the pool under certain circumstances and subject to certain limitations and exclusions. Latham's warranty does not cover "[d]amage or failure resulting from improper or unauthorized draining of the Pool or the rising of the ground water table above the Pool water level."

4

stated "[i]n no way will I accept a patch job on this." Outdoor Living continued working with Latham and the Caronnas over the next several months in an attempt to have the pool repaired. On December 16, 2019, a Latham representative came out to the Caronnas' house to inspect the pool in person. Thereafter, Latham's warranty director, Richard Black, who participated in the inspection via FaceTime, documented the damage to the pool and concluded that it would be possible to repair the damage to the Caronnas' pool, but that the repairs would not be covered by Latham's warranty because the damage was caused by hydrostatic pressure.

On January 7, 2020, Skip emailed Robin about Latham's findings following the inspection and explained to her that damage from hydrostatic pressure is not covered under either Latham's or Outdoor Living's warranty. Nevertheless, Skip communicated an offer on behalf of Latham and Outdoor Living to repair the damage at no cost to the Caronnas. Skip explained that Latham would repair the fiberglass shell, and Outdoor Living would remove and replace the portion of the concrete deck and coping needed to make the repairs. Robin rejected this offer, insisting that the concrete decking had cracks "all the way around it spidering out" and needed to be fully replaced, and stating that "if this is the only solution you are providing" she would contact an attorney. In response to the concerns Robin expressed about the offered repairs, Skip replied:

> Latham has assured us that the repairs to the pool shell will be as strong as the original shell. The bottom of the pool will be sprayed so that there will [sic] no visible patch. This needs to be the first step to resolve this issue. We would like to get your shell on their schedule as soon as possible.
>
> If the deck is your next concern, then Outdoor Living will agree to add a spray deck to your deck after repairs are made to cover "spider cracks[.]"
>
> Outdoor Living will have American Leak Detection survey all plumbing to assure no leaks.

Robin did not respond to this offer from Skip.

On May 11, 2020, the Caronnas filed a petition for damages against Outdoor Living and Latham, alleging that they suffered extensive property damage as a result of the defendants' failure to comply with the specifications set forth in the contract and/or the warranties implicit in contracts, as well as nonpecuniary damages as a result of the defendants' negligence. The Caronnas' petition alleged that Outdoor Living improperly or carelessly installed and/or maintained the fiberglass pool, underground plumbing, and Pentair pump, resulting in leaks in the underground plumbing; failed to properly inspect the reasons for and respond to the multiple error codes on the Pentair pump and the significant water loss from the pool; and failed to properly use (or improperly removed) the submersible pump. The Caronnas alleged that Latham manufactured or produced the fiberglass pool shell and provides a lifetime warranty for the fiberglass shell. The Caronnas sought monetary damages for the damage to their backyard, nonpecuniary damages for the loss of enjoyment and use of the backyard and for their mental and emotional anguish, and attorney fees.

Outdoor Living filed a reconventional demand against the Caronnas, seeking damages arising from the Caronnas' alleged publication of defamatory remarks that falsely accused Outdoor Living of poor workmanship, illicit business practices, and deceit.[3] Outdoor Living also filed a third party demand against its insurer, Covington Specialty Insurance Company ("Covington"), for Covington's arbitrary and capricious denial of its claim for defense and indemnity under Covington Policy No. VBA72211000.[4]

---

[3] Although Outdoor Living's reconventional demand contains a vague reference to a suit on open account, the allegations of Outdoor Living's reconventional demand concern only a defamation claim. The Caronnas answered the reconventional demand, noting that the language regarding a suit on open account appears to be an error and addressing the allegations of defamation actually made in the reconventional demand. Thereafter, in the Pretrial Order filed by the parties, Outdoor Living again referenced a suit on open account, stating that it "has filed a reconventional demand for the remaining amounts owed on the pool against the plaintiffs/defendants-in-reconvention[;]" however, the reconventional demand contains no such claims.

[4] Covington filed a motion for summary judgment seeking dismissal of Outdoor Living's Third Party Demand. Following a hearing, Covington's motion for summary judgment was denied by the trial court on November 18, 2022.

Outdoor Living filed a Daubert motion to exclude the expert report prepared by the Caronnas' damages expert, Pinnacle Exterior Construction ("Pinnacle"), as well as expert testimony from any representative of Pinnacle. Outdoor Living argued that Pinnacle's expert report should be excluded because it is actually just a quote of demolition costs for the existing pool and concrete decking and installation of a new pool, and it is not signed by any Pinnacle representative, does not include exhibits used to support the opinions expressed in the report, and does not include any documentation to support the qualifications of the preparer.[5] The trial court considered Outdoor Living's Daubert motion prior to the beginning of the trial on December 21, 2022. Outdoor Living argued that in addition to the fact that the quote prepared by Pinnacle for demolition, removal, and replacement of the pool and concrete decking lacked any substance relating to the preparer of the report's identity or qualifications, the quote is completely irrelevant on the issue of the cost of repair or replacement of the Caronnas' fiberglass pool because Pinnacle does not work with fiberglass pools and the Pinnacle quote is for demolition, removal, and replacement of the Caronnas' fiberglass pool with a gunite pool. After hearing arguments from counsel for both Outdoor Living and the Caronnas, the trial court agreed that the Pinnacle quote did not meet the requirements for an expert report and granted the Daubert motion in part, precluding Pinnacle or its representative, Shane Dantin, from "testifying as an expert witness in giving any opinion." Nevertheless, the trial court stated that it would not preclude the Caronnas from introducing the Pinnacle quote through Mr. Dantin as a lay witness, but that the defendants would have the opportunity to cross-examine Mr. Dantin with regard to some of the issues raised, such as the comparison of fiberglass and

_____

[5] Outdoor Living's Daubert motion also sought to exclude the testimony of the Caronnas' expert witness, Ryan Dunlevy, P.E., a civil engineer, on the grounds that Mr. Dunlevy intended to offer his opinion as to the cause of the damage to the pool based only on a visual inspection of the premises conducted nearly a year after the damage occurred. However, consideration of Outdoor Living's Daubert motion regarding Mr. Dunlevy was pretermitted, as counsel for Outdoor Living agreed to lodge any objections as to Mr. Dunlevy's testimony during voir dire. Mr. Dunlevy's qualifications to testify as an expert witness are not at issue in this appeal.

gunite pools, and the trial court would "take whatever relevant information it gets from that testimony in awarding damages in this matter."

Robin Caronna testified at trial about their reasons for installing a pool, the problems they experienced with the pool, their attempts to have Outdoor Living and Latham address the damage, and their losses resulting from the damage to their pool. Robin testified that she and her husband wanted to install a pool in their backyard so that their young sons, who loved to swim, would have a place to entertain friends. Once the pool was complete, the Caronnas used it almost daily, weather permitting. After about a month of use, the Caronnas started experiencing intermittent problems with the Pentair pool pump shutting off and displaying error codes, which continued until October when the extensive damage to the pool occurred and rendered the pool unusable. Robin testified that as of the date of trial, over three years after the damage occurred, the pool has still not been repaired or replaced because they did not have the funds to do so. Although Robin testified that her family has been completely unable to use their backyard for the past three years because she considers the current condition of the pool to be a hazard, she testified that they did not sustain any property damage aside from the damage to the fiberglass pool and the concrete decking, nor did they sustain any personal physical injury.

Robin testified that after the damage occurred, Skip promised her that he would "make this right," which she assumed meant a replacement, not repair, of the pool and decking. As a result, when Bryce contacted her on October 29, 2019 to say that Latham was in the process of scheduling the repairs to the pool, she emphatically rejected the offer of a repair. She explained at trial that she had insisted on replacement of the pool and concrete decking because "we paid a lot of money for a pool that we had for a little over three months, and we didn't pay that much money for a patched-up pool that we had no way of knowing would be

warranted or if we had another issue in ten years where would we be." Robin likewise rejected the offer communicated by Skip in a January 7, 2020 email, in which he proposed to have the fiberglass shell repaired by Latham and the necessary portions of the deck and coping removed and replaced by Outdoor Living, all at no cost to the Caronnas. Robin replied to Skip's email, stating that the decking needed to be fully replaced because "there are cracks all the way around it spidering out," and that if this was the only solution being offered, she would contact an attorney. At trial, Robin explained that she did not consider the solution offered by Skip to be satisfactory because she was skeptical of the repairs offered and had "concerns" about the warranty. Robin testified that Skip attempted to address her concerns in a follow-up email on January 10, 2020, in which he assured her that the repaired pool shell would be as strong as the original shell and the bottom of the pool would be sprayed so that there would be no visible patch, and offered to add a "spray deck" to the decking after the repairs were complete to cover any "spider cracks" and to have American Leak Detection survey all plumbing to assure that there are no leaks. However, Robin remained skeptical that the proposed repairs would be satisfactory and believed that a repaired pool and deck was "not what [they] paid for." Robin did not reply to Skip's follow-up offer or communicate any further with Outdoor Living after this date, and instead obtained counsel and filed the instant suit against Outdoor Living and Latham.

Skip Noel testified that Outdoor Living had recently begun installation of pools. He estimated that Outdoor Living had installed about six fiberglass pools and several gunite pools prior to the Caronnas' project. Although he has a commercial pool license, he testified that the Caronna job was mostly handled by Bryce, and his participation was limited to "a little supervisory work" and operating equipment. Following the damage to the Caronnas' pool, Skip contacted Latham to get the fiberglass pool shell repaired. Skip recalled that Robin was

adamant about wanting a new pool and all new concrete decking, despite assurances that the repaired pool shell would be as strong or stronger than a new pool. After consulting with Latham, Skip emailed Robin an offer to repair the pool at no charge, including assurances about the integrity of the pool shell after repair, an offer to add a spray deck to the concrete to ensure that there would be no visible cracks, and an offer to have the pool inspected following repair by a leak specialist. Skip explained to Robin that the proposed repairs needed to be "the first step to resolve this issue," but Robin did not accept the offered repairs.

Bryce Noel testified that he did not have a contractor's license to build pools, but he had attended Latham's training "boot camp" for its new dealers, which involved teaching the dealers about Latham's pools and showing them how the pool should be installed, including discussions of plumbing issues and acceptable materials for backfill. In addition, he testified that he had received training on plumbing procedures for his irrigation license. Bryce estimated that Outdoor Living had installed approximately twenty-five pools before beginning the Caronnas' pool, five or six of which were fiberglass, and testified that the Caronnas' pool is the only pool Outdoor Living has installed that had a warranty claim.

Bryce testified that when he went to the Caronnas' home on October 14, 2019 to investigate the water loss, he found the water level to be at the bottom one-third of the skimmer basket and the skimmer plug to be loose. He did not see any other obvious defects. Based on those findings, he believed that the water loss was occurring due to the skimmer plug and that it would need to be replaced. He explained that in order to change out the skimmer plug, he needed to lower the water level in the pool to a point below the skimmer plug, and before lowering the water level in the pool, he needed to remove any groundwater around the pool to prevent damage to the pool. After leaving a sump pump in place overnight to

remove any groundwater around the pool, Bryce returned the following day to replace the skimmer plug. Bryce testified that when he returned on Tuesday, it did not appear that the water level in the pool had dropped at all overnight, and he recalled having to use the sump pump to remove water from the pool in order to work on the skimmer plug. After he replaced the skimmer plug, Bryce began refilling the pool, which he testified took most of the day, and when the pool was refilled to the appropriate level, he removed the sump pump. Bryce testified that he returned to the Caronnas' home the next morning to check on the water level in order to confirm that the problem had been resolved, and observed that the water level in the pool had dropped several inches overnight. Based on this, he suspected that a leak was present and decided to contact a leak detection specialist to schedule testing of the Caronnas' pool. Although he was advised that the leak detection specialist did not have any availability for approximately a week, Bryce did not return to the Caronnas' home and reinstall the sump pump, nor did he inform the Caronnas that he suspected a leak or instruct them to keep refilling the pool. He explained at trial that he did not think the water had dropped low enough for the sump pump to be necessary, and he assumed that the Caronnas' pool would continue losing water at the same rate that it had been for the last few days and would not get too low before the leak specialist could arrive. However, that evening, Robin informed him that the water was below the level of the jets and the concrete was cracking and separating. At that time, Bryce and Skip brought a sump pump to the Caronnas' home, where they found that the pool water was brown and had dropped to a level four to five inches below the tile. By the next morning, the pool had drained so much that the crack in the floor of the pool was visible. At this point, Bryce cancelled the leak detection specialist because once the pool floor cracked and the pool lifted, there was no way to tell if any defects

discovered during testing were preexisting or were caused by the cracking and lifting of the pool.

Bryce testified that Outdoor Living reported the damage to Latham, who concluded based on the pictures of the damage and other information provided by Outdoor Living that the damage was not covered under Latham's warranty and that the cost to repair the damage to the fiberglass shell[6] would be $2,050.83. However, when Bryce informed Robin that Latham was going to repair the pool, she rejected the idea of a repair and insisted that the pool and concrete decking be replaced. Although Outdoor Living offered on more than one occasion to repair the Caronnas' pool and decking at no charge, Bryce testified that Robin refused their offers.

Richard Black, Latham's warranty director at the time the issues arose with the Caronnas' pool, testified that Latham was contacted by Outdoor Living after the Caronnas' pool cracked and lifted. As the warranty director, he was responsible for overseeing warranty claims and repair claims (warranty or otherwise). Although he did not inspect the Caronnas' pool personally, he received photographs from different people and also participated by Facetime when a Latham representative inspected the Caronnas' pool on December 16, 2019. Mr. Black documented his observations following the Facetime inspection in an email to other Latham personnel and Latham's counsel that same date. In part, Mr. Black noted:

> There is some slight damage to the concrete deck but nothing that is structurally significant. [One paver is] loose and there is slight cracking in the grout between the top of the tile and bottom of the paver. This can be remedied fairly easily. The walls have not moved with the exception of an area directly adjacent to the sump pit and near the crack in the shell. The wall in this area is noticeably bowed inward.

---

[6] The Repair Agreement between Latham and Outdoor Living described the repairs needed as "6' crack from heaved floor."

> Based on the stain on the deck running away from the sump pit, it appears that at some point in time, the water around and under the shell became high enough that it actually ran up and out of the inspection tube and out, onto and off of the deck. This is a significant fact in that it substantiates the theory that hydrostatic pressure caused the heaved floor and the crack in the floor – not covered by the warranty.

> The floor can be repaired to be structurally sound. To correct the bowed wall, concrete would need to be removed from that area, the backfill removed so the wall can return to its original position and then the pool filled, the backfill replaced and the deck re-poured.

Mr. Black concluded that the damage could not have been caused by a defect in the pool shell. He testified at trial that if there had been a crack in the pool shell, the pool would not have lifted and the walls would not have bowed in because the water inside and outside the shell would have been able to equalize.

Mr. Black testified that in his time in the warranty department, Latham received approximately 150 warranty claims a year (most involving hairline cracks), and in all but one instance that he was aware of, the first course of action had been to attempt to repair the pool before considering replacement because a repair can almost always be achieved. In the case of the Caronnas' pool, Mr. Black's recommendation was to repair the pool shell. He testified that Latham has done the type of significant repairs needed for the Caronnas' pool before, and while the repair process would be "very laborious," once repaired, the pool could be "as strong or stronger than it was to start with." He testified that Latham would do its best to ensure that the repairs were not visible, including spraying the entire floor, rather than just the repaired area, so that the appearance would be uniform, but he could not say that it would not be possible for someone looking at the floor of the pool to see a slight difference between the repaired area and the original finish. Regarding warranty coverage following repair, Mr. Black testified that he could not say for certain before the repairs were made that the repaired pool would be covered by Latham's warranty. He testified that if the repairs went as expected

and no unforeseen conditions were discovered that prevented the pool from being returned to "like condition," Latham's warranty would remain in effect on the repaired pool.

The Caronnas' expert witness, Ryan Dunlevy, P.E., was accepted by the court as an expert in aquatic and structural engineering. Mr. Dunlevy testified that when he inspected the Caronnas' pool on September 1, 2020, the pool was almost empty, with the exception of some water in the deep end of the pool with excessive algae growth, and he observed "significant bowing in the pool floor" and a "rupture" in the deep end of the pool. While walking on the fiberglass shell, Mr. Dunlevy could hear a hollow sound, which he testified indicated that there was groundwater beneath the pool. Based on his inspection of the pool, Mr. Dunlevy formed an opinion that the damage to the Caronnas' pool was a direct result of the water level in the pool going down, either through a leak or some other mechanism:

> [S]omething was causing the water level to dissipate, to go down . . . . So some mechanism, some leak, or some other component with the pool, whether it be owner-based[7] or installer-based[,] was causing the water to evacuate the pool at a rate that was higher than what it can be refilled with, and at some point the hydrostatic pressure from below overtook the weight from the resisting water above and it caused the pool to pop up slightly, and it ultimately caused the deformation which led to the rupture in the deep end of the pool to occur.

Mr. Dunlevy testified that the water loss reported by Robin of four-to-five-inches overnight indicated the presence of a leak. He could not provide an opinion on exactly where the leak originated because once the pool ruptured and lifted, there was no way to tell whether any cracks he might discover occurred prior to the pool lifting or afterwards. He did not believe that the skimmer plug could have been the source of the leak in the Caronnas' pool, because the photographs of the pool in evidence showed that the water level continued dropping after it was below the

---

[7] Mr. Dunlevy testified that, besides a leak, the only other possible explanation for the water loss and damage that occurred would be if the Caronnas willfully evacuated the water out of the pool themselves. However, there is no evidence to suggest that the Caronnas drained the pool or did anything to cause the damage to the pool.

level of the skimmer. However, he testified that there are many potential leak points in any pool, such as the fittings for the lights, drains, or pipes (including the fittings in pipes running between the pool and the pump) and the valves. Mr. Dunlevy explained that fittings in a pool are typically glued together, and it may take a few months before a fitting starts showing signs of a leak. Additionally, he testified that "something can go from not leaking to a major leak very quickly, like almost instantly." Mr. Dunlevy testified that it is very important in a situation such as this one to use a sump pump to help reduce the hydrostatic pressure under the pool shell until it can be determined for certain that the leak has been repaired and that there are no further leaks. For this reason, he disagreed with Bryce's decision to remove the sump pump from the Caronnas' pool after changing the skimmer plug. He opined that if the sump pump was capable of keeping up with the rate of the leak and had remained in place until the actual source of the leak could be discovered and repaired, the Caronnas' pool would not have sustained the type of damage it did.

Mr. Dunlevy was also questioned about whether the Caronnas' pool could be repaired. He testified that he would recommend a replacement of the fiberglass shell rather than a repair because he did not believe that it would be possible to repair the damage to the fiberglass shell of the Caronnas' pool. He explained that although the ruptured fiberglass floor could be repaired to make it waterproof again, he believed that the pool floor had deformed to a point where he did not think that the shell could be exactly the same shape as it was when it was new or of the same quality or standards.

Shane Dantin, owner of Pinnacle Exterior Construction, testified that he has been licensed in residential and commercial pool construction since 2020 and, in that time, Pinnacle has installed over 300 pools. Although he is licensed and trained to install fiberglass pools, he testified that he has never installed a

fiberglass pool. Mr. Dantin testified that he visited the Caronnas' home in 2020 and prepared an estimate for the demolition and removal of the fiberglass pool, piping, plumbing, and concrete, and replacement with a gunite pool. Mr. Dantin explained that he prepared an estimate for a gunite pool because Pinnacle can build a gunite pool at or below the cost of a fiberglass pool, and he believes that a gunite pool is a better, stronger product for a cheaper price. Mr. Dantin estimated the total cost of demolition and removal of the Caronnas' pool and decking to be $12,378.00, the cost of replacing the Caronnas' fiberglass pool with a gunite pool to be $46,317.50, and the cost of installing a new concrete deck to be $10,493.00. Mr. Dantin's estimate also included an additional $4,290.00 for a "Multi-Coat Cool Decking" overlay on the new concrete deck, even though the Caronnas did not have this optional overlay on their original decking. The $46,317.50 estimate for replacement of the pool was stated as a lump sum, and included items that the Caronnas did not have in their fiberglass pool, such as an automatic water leveler, as well as other items or services for which no evidence was presented that they needed to be replaced or redone, such as "Electrical" and "Pool/Pump/Filtration equipment." Additionally, Mr. Dantin testified at trial that prices have increased industry-wide by about fifteen percent since his estimate was prepared in 2020.

At the conclusion of the bench trial, the trial court instructed the parties to submit post-trial memoranda for the court's consideration. After trial, but prior to the trial court's ruling, the Caronnas settled their claims against Latham, and Latham was dismissed from the suit on February 2, 2023. Thereafter, the trial court rendered its judgment on the merits on March 23, 2023. On the main demand, the trial court ruled in favor of the Caronnas and against Outdoor Living and Latham, fixing damages in the total amount of $68,572.20, which the judgment stated was comprised of $14,234.70 for the demolition and removal of the pool and $54,337.50 for the replacement of the pool. The trial court allocated

16

fifty percent of the fault for the Caronnas' damages to Outdoor Living and fifty percent to Latham; however, since the plaintiffs settled with Latham prior to trial, the total amount awarded to the Caronnas in the judgment was $34,286.10. The trial court denied the Caronnas' request for nonpecuniary damages. The trial court also dismissed the claims raised by Outdoor Living's Third Party Demand against Covington.[8]

The Caronnas appealed, arguing that the trial court erred in failing to conclude that the Caronnas' claims were based in redhibition and to award commensurate damages and attorney fees, in allocating any fault to Latham, in failing to award nonpecuniary damages, and in dismissing Outdoor Living's claims against Covington. Outdoor Living answered the appeal, arguing that the trial court erred in allocating any fault to Outdoor Living, in awarding any damages against Outdoor Living, in failing to reduce the award to the Caronnas due to their failure to mitigate their damages, and in considering inadmissible opinion testimony from a lay witness in calculating damages.

## DISCUSSION

### Redhibition

On appeal, the Caronnas argue that a hidden redhibitory defect somewhere in the pool system constructed by Outdoor Living rendered their pool useless and destroyed their backyard, and that Outdoor Living is responsible as a vendor-builder for the resulting damages. Accordingly, the Caronnas argue that the trial court erred in failing to award commensurate damages and attorney fees under the principles of redhibition.

---

[8] Although Outdoor Living's reconventional demand was mentioned in the Pretrial Order's "Concise Summary of Facts and Contentions," and the record contains no indication that the trial court ordered separate trials of the principal and reconventional demands pursuant to La. C.C.P. art. 1038, the judgment rendered by the trial court following the trial of this matter was completely silent as to Outdoor Living's reconventional demand. Generally, silence in a judgment as to any claim before the trial court is considered a denial of those claims. See *Louisiana Workers' Compensation Corp. v. Sims*, 2014-1378 (La.App. 1 Cir. 4/24/15), 2015WL1882608, *2. Nevertheless, Outdoor Living has not challenged the implicit rejection of its reconventional demand in its answer to the appeal, and, thus, this issue is not before us in this appeal. See *Isabelle v. Bayliner Marine Corp.*, 2005-2593 (La.App. 1 Cir. 11/3/06), 2006WL3187573, *14, n.15.

Louisiana jurisprudence has consistently held that a contract for the installation of a swimming pool is a building contract, not a sale, and is, therefore, not subject to the principles of redhibition. *Holland v. Hurst*, 385 So.2d 495, 496 (La.App. 1 Cir. 1980); *Linzay v. Sandy Ewing Aquatech Pools, Inc.*, 546 So.2d 311, n.1 (La.App. 3 Cir. 1989). The record before us supports the trial court's implicit finding that the contract between the Caronnas and Outdoor Living for the construction of a swimming pool and concrete deck is a building contract, to which the theory of redhibition is inapplicable. Accordingly, the Caronnas' arguments on appeal relative to redhibition are without merit.

*Breach of Contract*

Outdoor Living argues in its answer to the appeal that the trial court erred in rendering judgment against it on the Caronnas' claims, whether those claims arise from the implied warranty of good workmanship in building contracts or the express contractual warranty provision in the contract between the parties. To the extent that the Caronnas' claims are based on the implied warranty of good workmanship in building contracts, Outdoor Living argues that the Caronnas failed to carry their burden of proving that Outdoor Living's workmanship was defective or that it was the cause of their damages. Further, Outdoor Living argues that the Caronnas failed to prove that Outdoor Living breached the express warranty provision in the parties building contract.

Every building contract implicitly obligates the contractor to perform the work in a good, workmanlike manner, free from defects in either materials or workmanship, with the work suitable for its intended purpose. See La. C.C. arts. 1994[9] and 2769;[10] *Pinnacle Builders, Inc. v. John*, 2021-0335, pp. 5-6 (La.App. 1

---

[9] Louisiana Civil Code Article 1994 provides:

An obligor is liable for the damages caused by his failure to perform a conventional obligation.

A failure to perform results from nonperformance, defective performance, or delay in performance.

18

Cir. 12/22/21), 340 So.3d 107, 113. If the contractor fails to do the work he agreed to perform, or does not execute it in the manner and at the time he agreed to do it, he will be liable for damages that may ensue from his breach of the contract. See La. C.C. art. 2769. This provision has been interpreted in the jurisprudence to mean the cost of repairing any defects or of completing the work. *Matherne v. Barnum*, 2011-0827, pp. 11-12 (La.App. 1 Cir. 3/19/12), 94 So.3d 782, 790, *writ denied*, 2012-0865 (La. 6/1/12), 90 So.3d 442. However, where the defects are such that they cannot be corrected except by removing and replacing the construction, the jurisprudential remedy is to award whatever it takes to place the homeowner in the position he deserved to be in when the construction was completed, as if the obligation had been fulfilled; in other words, the owner is entitled to the cost of repairs necessary to convert the unsound structure into a sound one or the amount paid to remedy the defect. *Matherne*, 2011-0827 at p. 12, 94 So.3d at 790.

The trial court's factual conclusions with respect to a claim for unworkmanlike performance are governed by the manifest error standard of review. See *Rosell v. ESCO*, 549 So.2d 840, 844 (La. 1989); *Pinnacle Builders, Inc.*, 2021-0335 at p. 6, 340 So.3d at 113. If the trial court's findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse those findings even if convinced it would have weighed the evidence differently had it been the trier of fact. *Rosell*, 549 So.2d at 844. To reverse the trial court's determination of fact, an appellate court must review the record in its entirety and find that a reasonable factual basis does not exist for the finding, and further determine that the record clearly establishes that the fact finder was clearly

---

[10] Louisiana Civil Code Article 2769 provides:

> If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract.

wrong or manifestly erroneous. *Stobart v. State, Department of Transportation and Development*, 617 So.2d 880, 882 (La. 1993).

Where there is conflict in testimony, the trial court's reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. *Stobart*, 617 So.2d at 882. Further, when presented with two permissible views of the evidence, the trial court's choice between them cannot be manifestly erroneous or clearly wrong. *Stobart*, 617 So.2d at 883. Where the trial court's conclusions are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. *Rosell*, 549 So.2d at 844.

In this case, the Caronnas offered the opinion of their expert witness, Ryan Dunlevy, P.E., to prove the existence of a defect in the pool resulting from Outdoor Living's faulty workmanship or materials. Mr. Dunlevy's expert report, filed in evidence at the trial, states the following regarding the cause of the damage to the Caronnas' pool:

1. [P]rior to the rupture that occurred in the bottom of the swimming pool, there was a leak occurring through either the fiberglass shell or a penetration such as a return inlet or main drain fitting that was facilitating water escaping from the pool shell into the surrounding subgrade.

2. As the water continued to leak from the fiberglass pool shell into the surrounding subgrade, the pool began to lose water volume while the volume of water in the surrounding subgrade continued to increase. This led to a gradual "swelling" of the swimming pool floor which created stresses in the fiberglass shell due to the pressure of the ground water below the shell exceeding the weight of the water within the pool. At some point, the stresses occurring in the fiberglass shell exceeded the flexural strength of the fiberglass and caused a rupture to occur in the deep end of the swimming pool.

Mr. Dunlevy elaborated on the first portion of this opinion at trial, explaining that the leak that ultimately caused the damage to the Caronnas' pool could have

20

originated from a number of sources within the pool system, including any penetration into the pool shell, such as those for lights, drains, or jets; any fittings; any valves; or any of the pipes running from the pool to the pool equipment. He noted that because fittings are typically glued together, when there is a leak in a fitting, it can take a few months for signs of a leak to appear. Although Mr. Dunlevy could not pinpoint exactly which feature of the pool system the leak came from due to the extensive damage that occurred when the pool cracked and lifted, he was able to say with certainty that there had been a leak somewhere in the pool system and that the leak directly caused the damage. He explained that without a leak lowering the water level in the pool, the pool would not have lifted because the weight of the water in the pool would have overcome any hydrostatic pressure from groundwater and held the pool down. In addition, Mr. Dunlevy opined that if Bryce had not removed the sump pump from the Caronnas' pool until he was certain that the water loss was resolved by the changing of the skimmer plug, the extensive damage that followed would not have occurred.

While Mr. Dunlevy could not pinpoint where exactly the leak originated, his testimony was clear that there was a leak present in the pool system. Since the entire pool system was Outdoor Living's materials or workmanship, it is immaterial that Mr. Dunlevy was unable to pinpoint the exact component where the leak originated. Based on this evidence, we cannot say that the trial court erred in concluding that Outdoor Living breached the implied obligation to perform its work in a good, workmanlike manner, free from defects in either its materials or workmanship, with the work suitable for its intended purpose.

Outdoor Living also argues that it cannot be held liable for the repair or replacement of the Caronnas' pool based on the express contractual warranty because its contractual guarantee never became effective. Pertinent to this argument, the May 6, 2019 contract between the parties provides:

Outdoor Living . . . [g]uarantees its work to be free from defects in material and workmanship for a period of One year, from completion of pool, providing, owner has complied in full with terms and payments and other conditions of this contract.

[Outdoor Living] agrees to replace or repair defects on such job [of] which it has been given notice in writing.

. . .

Terms and Provisions of this guarantee are not to be effective until full payment of contract is received.

Warranty work will not begin until contract is completely paid in full.

Outdoor Living argues that it has no obligation to repair or replace any defects in its work under the contractual warranty because the Caronnas never paid Outdoor Living's invoice for the addition of the water feature. However, it is unnecessary for us to determine whether the express contractual warranty was in effect, since we have found that Outdoor Living is responsible for the repair or replacement of the defective construction as a result of its breach of the implied warranty of good workmanship. Accordingly, we pretermit consideration of this argument.

## Damages

Outdoor Living argues that the amount of damages awarded by the trial court was erroneous because the trial court failed to reduce the award based on the Caronnas' failure to mitigate their damages and because the trial court relied on inadmissible opinion testimony from a fact witness to increase the damage calculation.

The judgment fixed the Caronnas' damages at $68,572.20, which it specified was "comprised of $14,234.70 for the demolition and removal of the pool and $54,337.50 for the replacement of the pool."[11]

---

[11] Although the trial court judgment does not mention the concrete decking, it is clear from the amounts awarded that the trial court was awarding the cost of demolition, removal, and replacement of the pool and concrete deck.

Outdoor Living argues on appeal that the Caronnas' pool and concrete decking could have been repaired fairly quickly and at a much lower cost to the defendants than the removal and replacement cost awarded by the trial court. They assert that the Caronnas' refusal to allow the defendants to repair the pool and insistence on a full replacement of the pool and concrete decking constituted a failure to make reasonable efforts to mitigate their damages and should result in a reduction or denial of their damages.

The doctrine of mitigation of damages is set forth in La. C.C. art. 2002, which provides:

> An obligee must make reasonable efforts to mitigate the damage caused by the obligor's failure to perform. When an obligee fails to make these efforts, the obligor may demand that the damages be accordingly reduced.

This Article adjusts the conflict of interests that would otherwise exist when an obligee neglects to mitigate his damages and thereby exposes the obligor to further liability for consequences resulting from the obligor's failure to perform that were reasonably avoidable by the obligee. *Whitney Bank v. Garden Gate New Orleans, L.L.C.*, 17-362, pp. 9-10 (La.App. 5 Cir. 12/27/17), 236 So.3d 774, 783, *writ denied sub nom. Bank v. Garden Gate New Orleans, L.L.C.*, 2018-0174 (La. 3/23/18), 239 So.3d 298. The duty of an injured party to mitigate his damages presumes that further damage has occurred following the tort or breach of contract. *Id.*, citing *Schroeder v. DiPascal Cabinet Co., Inc.*, 467 So.2d 1380, 1382 (La.App. 5 Cir. 1985) (holding that a homeowner's damages for defective workmanship by a cabinet refinisher would not be reduced for failure to mitigate damages based on the homeowner's refusal to allow the defendant cabinet refinisher to attempt to redo the defective work because no further actual damage occurred to the cabinets).

23

The evidence in the record does not support the conclusion that any further damage occurred to the Caronnas' pool as a result of their refusal to allow the defendants to make repairs. Mr. Dunlevy, the Caronnas' expert witness, considered the pool beyond repair and recommended replacement based on the extent of the damage, which he did not believe had become any more severe with the passage of time. Although he did not inspect the pool until almost a year after the damage occurred, he testified that he looked at pictures taken in October 2019 and "the pool was almost in the exact same state that it was . . . a year later."

Rather than arguing that further damage to the pool has occurred, Outdoor Living's argument on the issue of mitigation of damages seems to be that the Caronnas should have accepted their offer of repairs because the repairs would be less expensive for the defendants than a full replacement. However, as previously noted, where the defects in workmanship are such that they cannot be corrected except by removing and replacing the construction, the jurisprudential remedy is to award whatever it takes to place the homeowner in the position he deserved to be in when the construction was completed, as if the obligation had been fulfilled. *Matherne*, 2011-0827 at p. 12, 94 So.3d at 790.

The trial court was presented with conflicting testimony as to whether the defects in the Caronnas' pool could be repaired or whether they could only be remedied by removal and replacement. Although Mr. Black testified that Latham could repair the pool shell to be as strong or stronger than it was to begin with, he could not say with certainty until the repairs were complete whether the warranty would remain in effect on the repaired pool, and he could not guarantee that the repairs to the pool shell would not be visible. Mr. Dunlevy, on the other hand, testified that the pool was beyond repair and that a full replacement was needed. He explained that while the ruptured floor could be repaired to make it waterproof again, the pool floor had deformed to a point where he did not believe that the

24

fiberglass shell could be exactly the same shape as it was when it was new or of the same quality or standards. Based on the evidence presented, we cannot say that the trial court erred in failing to reduce the Caronnas' damages based on their refusal to accept the offered repairs.

Outdoor Living also assigns error to the trial court's calculation of the damages award. Although the trial court did not issue reasons for judgment, and the judgment itself does not explain how the amounts awarded were calculated, it appears that for demolition and removal, the trial court awarded the amount set forth in Mr. Dantin's quote ($12,378.00), plus fifteen percent ($1,856.70) based on Mr. Dantin's testimony about industry-wide price increases since the quote was prepared, for a total of $14,234.70. For replacement, the trial court seems to have awarded the amount the Caronnas actually paid Outdoor Living for the construction of the pool and concrete decking ($47,250.00), plus 15% ($7,087.50), for a total of $54,337.50.

Outdoor Living argues that the trial court erred in considering Mr. Dantin's testimony that prices in the industry have increased by about fifteen percent since he prepared the quote for demolition, removal, and replacement of the Caronnas' pool. Outdoor Living alleges that Mr. Dantin's testimony is inadmissible opinion testimony from a lay witness and should not have been considered by the trial court to increase the damage award.

Generally, a witness not testifying as an expert may not give testimony in the form of opinions or inferences. This rule is subject to the limited exception of La. C.E. art. 701, which provides:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are:
>
> (1) Rationally based on the perception of the witness; and

25

(2) Helpful to a clear understanding of his testimony or the determination of a fact in issue.

Thus, a lay witness may give opinion testimony based on his training, investigation, perception of the scene, and observation of physical evidence. *Lee v. Louisiana Bd. of Trustees for State Colleges*, 2017-1433, p. 9 (La.App. 1 Cir. 3/13/19), 280 So.3d 176, 185, *writ denied*, 2019-01647 (La. 1/14/20), 291 So.3d 690. The trial court is vested with great discretion in the determination of the competence of a witness based on experience alone. *Tyler v. Tyler*, 2016-60, p. 8 (La.App. 3 Cir. 9/28/16), 203 So.3d 308, 314.

Mr. Dantin testified that he is a licensed commercial and residential contractor and has been licensed in commercial and residential pool construction since 2020. He has worked for Pinnacle since 2015, and in that role, he oversees estimating, sales, and project management, and has overseen the installation of approximately 300 swimming pools. Mr. Dantin testified that he prepared the quote for the Caronnas' pool in 2020 or 2021, and based on his day-to-day experience working in this capacity in the swimming pool industry, the prices quoted in his estimate for the demolition, removal, and replacement of the Caronnas' pool would have increased by about 15% since then. Bryce Noel also testified that prices have increased over the years since the Caronnas' pool was installed. Given Mr. Dantin's extensive experience with estimating and swimming pool construction, the trial court did not abuse its discretion in allowing Mr. Dantin to testify about the price increases he has personally observed in the industry.

*Nonpecuniary Damages*

The Caronnas argue that the trial court erred in failing to award nonpecuniary damages for their mental anguish, distress, inconvenience, and aggravation. Damages for nonpecuniary loss may be recovered when the contract, because of its nature, is intended to gratify a nonpecuniary interest and, because of

26

the circumstances surrounding the formation or the nonperformance of the contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss. La. C.C. art. 1998. Where factually appropriate, nonpecuniary damages may be proven and recovered in a breach of contract case. *Matherne*, 2011-0827 at p. 13, 94 So.3d at 791. Whether the gratification of some nonpecuniary interest is the principal object of a contract is a question of fact, and the decision of whether to award damages is within the trial court's discretion. *Id.* The Caronnas urge that they carried their burden of proof through Robin's testimony that she and her husband wanted a swimming pool to give their young sons a place to enjoy their backyard and to entertain guests and that the damage to the pool has rendered their backyard unsafe and completely unusable. No evidence was offered that, because of the circumstances surrounding the formation or the nonperformance of the contract, Outdoor Living knew or should have known that their failure to perform would cause that kind of loss to the Caronnas. Furthermore, the record reflects that immediately after the damage occurred, Outdoor Living began efforts to have the damage to the Caronnas' pool and concrete decking repaired so that they could quickly resume use of their pool, but Robin rejected all offers of repair and attempts to address her concerns. Based on the evidence presented, we cannot say that the trial court abused its discretion in denying the Caronnas' claim for nonpecuniary damages.

### Allocation of Fault

The Caronnas also argue that the trial court erred in allocating any fault to Latham, since the Caronnas only contracted with Outdoor Living, not Latham, for the construction of the pool and since "no evidence was introduced at trial to prove or even suggest any negligence by Latham . . . caused or contributed to the pool's floating and concurrent damage."

Louisiana Civil Code article 2323 provides:

A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.

B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.

C. Notwithstanding the provisions of Paragraphs A and B, if a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced.

Although Latham was dismissed from the suit prior to the issuance of the March 23, 2023 judgment after settling with the Caronnas, the trial court is required to determine the fault of all persons causing or contributing to injury, death, or loss, regardless of whether the person is a party to the action or a nonparty, and regardless of the theory of liability asserted against that party. *Aaron v. Exxon Mobil Corp.*, 2018-0476, p. 15 (La.App. 1 Cir. 12/27/18), 271 So.3d 205, 216; La. C.C. art. 2323. A trier of fact's findings as to percentages of fault are factual and, in the absence of clear or manifest error, must be upheld on appeal. *Great West Casualty Co. v. State ex rel. Dept. of Transportation and Development*, 2006-1776, p. 7 (La.App. 1 Cir. 3/28/07), 960 So.2d 973, 977-78, *writ denied*, 2007-1227 (La. 9/14/07), 963 So.2d 1005. Allocation of fault is not an exact science, or the search for one precise ratio, but rather an acceptable range, and any allocation by the factfinder within the range cannot be clearly wrong. *Aaron*, 2018-0476 at p. 19, 271 So.3d at 218. Nevertheless, a person's degree or

28

percentage of fault may not be quantified pursuant to La. C.C. art. 2323 absent proof that the person caused or contributed to the plaintiff's loss. See *Duzon v. Stallworth*, 2001-1187, pp. 17-20 (La.App. 1 Cir. 12/11/02), 866 So.2d 837, 853-54; see also La. C.C. art. 2323(A).

After our review of the record in its entirety, we find that there was no evidence presented that would prove, by a preponderance of the evidence, that Latham or any defective condition of the pool shell caused or contributed to the Caronnas' damage. Although Mr. Dunlevy testified that there were many possible avenues through which a pool could leak, including "through the fiberglass shell," his testimony was clear that there was no way to tell where in the pool system the leak originated due to the extensive damage that followed. Any defects discovered in any testing performed after the damage occurred could easily have been caused by the lifting and cracking of the pool. In addition, Mr. Black, Latham's warranty director, testified that he believed that the fiberglass pool shell was intact prior to the floor rupturing because the pool would not have lifted and the walls would not have bowed if the water around and under the pool could move freely through the pool shell. As no reasonable factual basis exists for the trial court's apparent finding that Latham caused or contributed to the Caronnas' damages, the trial court erred in rendering judgment against Latham on the Caronnas' claims. See *Stobart*, 617 So.2d at 882.

Furthermore, absent a finding that Latham caused or contributed to the Caronnas' damages, the trial court's consideration of Latham in its allocation of fault was erroneous. See *Duzon*, 2001-1187 at p. 17-20, 866 So.2d at 853-54. Accordingly, we reverse the portion of the March 23, 2023 judgment in favor of the Caronnas and against Latham, allocating fifty percent of the fault to Latham, and amend the judgment against Outdoor Living to allocate one hundred percent of the fault to Outdoor Living.

*Outdoor Living's Third Party Demand Against Covington*

Finally, the Caronnas argue that the trial court erred in denying Outdoor Living's Third Party Demand seeking defense and indemnity from its insurer, Covington, under Policy No. VBA72211000,[12] as well as costs and attorney fees for the arbitrary and capricious denial of defense and indemnity, because Covington failed to prove that the policy excluded coverage for all of their claims against Outdoor Living. The Caronnas do not argue that Policy No. VBA72211000 would provide coverage for its claims for property damage to the swimming pool and concrete deck installed by Outdoor Living; rather, they argue that the policy's coverage for products-completed operations hazard would cover their claims for "loss of use of the backyard and patio and non-pecuniary/emotional damages." Since the trial court did not award these types of damages, and since we have found no error in the trial court's award of damages, this assignment of error is moot.

## CONCLUSION

For the reasons set forth herein, the March 23, 2023 trial court judgment is reversed insofar as it renders judgment against Latham Pool Products, Inc. and allocates fifty percent of the fault to Latham Pool Products, Inc. The judgment is

---

[12] Outdoor Living's Third Party Demand against Covington sought defense and indemnity for the claims made against it by the Caronnas under Policy No. VBA72211000, effective September 26, 2019 through September 26, 2020. At the trial of this matter, the parties stipulated to a number of facts and joint exhibits. At the time the stipulation was read into the record, a disagreement arose over the inclusion of a second Covington insurance policy (Policy No. VBA649229, effective September 26, 2018 through September 26, 2019) that was not mentioned in the Third Party Demand. As the parties could not reach an agreement regarding the inclusion of the second policy in the stipulation, the portion of the stipulation of facts concerning the Covington insurance policies was removed. In addition, Joint Exhibit 17-B, which contained a certified copy of Policy No. VBA649229, effective September 26, 2018 through September 26, 2019, was removed from Joint Exhibit 17. Accordingly, after informing the court that she was "taking out a bulk of Number 17," counsel for the Caronnas told the court that the parties stipulated to the introduction of:

> Joint Exhibit 17, Covington Specialty Insurance Policy, which was originally both policies, but will apparently be Policy [VBA722110], although the affidavit attached to it . . . does reference both policies.

Although the parties clearly stipulated to the introduction of Exhibit 17-A, Policy No. VBA722110, effective September 26, 2019 through September 26, 2020, it appears that the wrong policy was removed from Joint Exhibit 17, as the exhibit actually filed in evidence and included in the appellate record is Exhibit 17-B, Policy No. VBA649229, effective September 26, 2018 through September 26, 2019.

The Caronnas' arguments in this assignment of error are that they are entitled to coverage under the provisions of Policy No. VBA722110, which was not actually filed into evidence at the trial. In any event, since we have determined that this assignment of error is moot, this omission does not prevent our review of this matter.

amended to allocate one hundred percent of the fault to Outdoor Living, LLC and/or Outdoor Living Pools, LLC.  In all other respects, the March 23, 2023 judgment is affirmed.  Costs of this appeal are assessed to defendant, Outdoor Living, LLC and/or Outdoor Living Pools, LLC.

**REVERSED IN PART; AMENDED; AFFIRMED AS AMENDED.**

STATE OF LOUISIANA
COURT OF APPEAL
FIRST CIRCUIT

2023 CA 1048

ROBIN CARONNA AND JOSHUA CARONNA, SR.

VERSUS

OUTDOOR LIVING, LLC AND/OR OUTDOOR LIVING POOLS, LLC,
AND LATHAM POOL PRODUCTS, INC.

**PENZATO, J., concurring in part.**

I agree with the majority that the portion of the judgment casting Latham with a percentage of fault should be reversed. However, I respectfully disagree with the reasoning provided by the majority.

The evidence establishes that Latham manufactured the fiberglass shell of the Caronnas' pool under its "Trilogy Pools" branded product line. Where no contractual privity exists between the manufacturer of an allegedly defective product and the buyer, the manufacturer may be liable in tort under the Louisiana Products Liability Act ("LPLA," La. R.S. 9:2800.51, *et seq*) or in sales, through redhibition (La. C.C. arts. 2520, etc.). See Tooley-Knoblett, Gruning; *Redhibition, warranty of fitness, and the Louisiana Products Liability Act*, 24 La. Civ. L. Treatise, Sales. §11:47 (Nov. 2023 update). The LPLA applies where the plaintiff sustained damages caused by the manufacturer's unreasonably dangerous product. See La. R.S. 9:2800.53(5);[1] La. R.S. 9:2800.54; 24 La. Civ. L. Treatise, Sales. §11:47; *Jack v. Alberto-Culver USA, Inc.*, 2006-1883 (La. 2/22/07), 949 So.2d 1256, 1258.

---

[1] "Damage" under the LPLA is defined as "all damage caused by a product, including survival and wrongful death damages, for which Civil Code Articles 2315, 2315.1 and 2315.2 allow recovery. 'Damage' includes damage to the product itself and economic loss arising from a deficiency in or loss of use of the product only to the extent that Chapter 9 of Title VII of Book III of the Civil Code, entitled 'Redhibition,' does not allow recovery for such damage or economic loss[.]" La. R.S. 9:2800.53(5)

1

The Caronnas did not allege the pool shell was unreasonably dangerous; therefore, their cause of action against Latham is not governed by the LPLA. See La. R.S. 9:2800.54.

Instead, the Caronnas sought to recover for damages to the pool caused by a defect in the pool. This type of claim is subject to the law of redhibition for breach of implied warranty. See *ExPert Riser Solutions, LLC v. Techcrane International, LLC*, 2019-1165 (La. App. 1st Cir. 12/30/20), 319 So.3d 320, 326; John Kennedy, *A Primer on the Louisiana Products Liability Act*, 49 La. L. Rev. 565, 580 (1989). Therefore, I believe we must consider whether the record reasonably supports the trial court's finding that Latham is liable under the law of redhibition.[2]

The Caronnas, as buyers, had the burden of proving the existence of a redhibitory defect in the pool shell by a preponderance of the evidence. *Morris v. United Services Automobile Association*, 32,528 (La. App. 2d Cir. 2/18/00), 756 So.2d 549, 561. Proof of a redhibitory defect may be by direct or circumstantial evidence, which gives rise to a reasonable inference the defect existed. The buyer need not prove the underlying cause of the defect but only that it existed. *Id.*

Circumstantial evidence is evidence from which the existence of the fact to be determined may be reasonably inferred. When a party relies solely on circumstantial evidence, as the Caronnas did, that evidence must exclude, with a fair amount of certainty, every reasonable explanation for what happened other than the fact sought to be proven. *Babin v. Burnside Terminal, Greater Baton Rouge Port Commission*, 577 So.2d 90, 96 (La. App. 1st Cir. 1990). The evidence need not negate every other possible explanation, only all other reasonably probable explanations. The party seeking to prove a particular fact by circumstantial evidence has satisfied his burden of proof if the evidence, taken as a whole, shows the fact sought to be proven is the

---

[2] The result would be the same under a theory of negligence pursuant to La. C.C art. 2315. See *Hanks v. Entergy Corp.*, 2006-477 (La. 12/18/06), 944 So.2d 564, 579 (discussing the burden of proof in a negligence action where the plaintiff relies on circumstantial evidence).

most plausible explanation for what occurred, and no other mutually exclusive fact can as reasonably explain the outcome. *Babin*, 577 So.2d at 96. <u>See also</u> *Pontchartrain Natural Gas Systems v. Texas Brine Co., LLC*, 2018-1249 (La. App. 1st Cir. 12/30/20), 317 So.3d 715, 746, *writs denied*, 2021-00382, 2021-00386 (La. 6/8/21), 317 So.3d 323; and *Crews v. Broussard Plumbing & Heating*, 2009-1268 (La. App. 3d Cir. 5/12/10), 38 So.3d 1097, 1101. When other reasonable inferences of equal weight may be drawn from the documentary evidence as to the cause of malfunctioning, a prima facie case is not established. *Edelman Systems, Inc. v. Capitol GMC, Inc.*, 345 So.2d 99, 101 (La. App. 1st Cir. 1977) (finding the plaintiff, who relied solely on repair invoices to prove a defect existed, failed to satisfy her burden of proof in redhibition).

Although Mr. Dunlevy opined the leak in the Caronnas' pool may have been caused by a crack in the fiberglass shell, he identified numerous other possible sources of the leak, all of which are reasonably probable explanations for the eventual rupture of the pool. No other evidence was offered at trial to show that a crack in the shell is the most plausible explanation for what occurred or that "no other mutually exclusive fact can as reasonably explain the outcome." *Babin* v, 577 So.2d at 96. <u>See</u> *Jessen v. Dr. Kenneth W. Wimberly, D.D.S.*, 610 So.2d 252, 257 (La. App. 3d Cir. 1992) (affirming the trial court's finding that the plaintiff failed to prove redhibition. The plaintiff's dentures did not fit correctly, but no one was able to identify the cause of the problem.).

Thus, I find no reasonable basis in the record for the trial court's determination that Latham is liable to the Caronnas for the damage sustained by the pool. The trial court manifestly erred in finding Latham liable, and this portion of the judgment must be reversed.

**STATE OF LOUISIANA
COURT OF APPEAL
FIRST CIRCUIT**

**DOCKET NUMBER
2023 CA 1048**

**ROBIN CARONNA AND JOSHUA CARONNA, SR.**

**VERSUS**

**OUTDOOR LIVING, LLC AND/OR OUTDOOR LIVING
POOLS, LLC, AND LATHAM POOL PRODUCTS, INC.**



**GREENE, J., concurring in part, dissenting in part, and agreeing in part.**

I respectfully concur in part, dissent in part, and agree in part with the majority

opinion. I concur with the issue of coverage as the relevant policy is not in the record.

I dissent from the finding of manifest error in the assessment of fault. I agree with the

remainder of the report.